IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEPHANIE ADAMS,
    *Plaintiff*,

v.                                Civil Action No. ELH-12-2130

WELLS FARGO ADVISORS, LLC,
    *Defendant*.

**MEMORANDUM OPINION**

Stephanie Adams, plaintiff, sued her former employer, Wells Fargo Advisors, LLC ("WFA"), defendant, asserting thirteen counts arising out of her employment at WFA and her subsequent termination. *See* Second Amended Complaint ("SAC"), ECF 29.[1]  In particular, she alleges the following counts: (I) breach of contract; (II) gender discrimination, in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000e *et seq*; (III) gender discrimination, in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2009 Repl. Vol., 2013 Supp.), § 20–606 of the State Government Article ("S.G."); (IV) disability discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 *et seq.*; (V) disability discrimination, in violation of the MFEPA, S.G. § 20–606; (VI) unlawful retaliation under Title VII; (VII) unlawful retaliation under the MFEPA, S.G. § 20–606; (VIII) "Employment-Libel or Slander on Form U-5"; (IX) "Libel"; (X) unlawful withholding of wages earned under a WFA employee incentive program called the "4Front Program," in violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md.

---

[1] Plaintiff filed suit in the Circuit Court for Baltimore City.  ECF 2.  Defendant removed the case to this Court, pursuant to 28 U.S.C. § 1441.  ECF 1.  Plaintiff has since amended her Complaint two times.  *See* ECF 15; ECF 29.

Code (2006 Repl. Vol., 2013 Supp.)**,** § 3-505 of the Labor and Employment Article ("L.E."); (XI) unlawful withholding of wages earned as commission income, in violation of L.E. § 3-505; (XII) fraud in the inducement; and (XIII) intentional infliction of emotional distress.

After discovery, WFA filed a motion for summary judgment ("Motion," ECF 55), supported by a memorandum of law ("Memo," ECF 55-1), and voluminous exhibits. Plaintiff filed a response in opposition ("Opp.," ECF 57), also supported by exhibits, to which WFA replied ("Reply," ECF 58). No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will deny the Motion as to Count I but grant it as to Counts II–XIII.

## Factual Summary[2]

Adams is a former financial advisor ("FA") at WFA, which is a non-bank affiliate and subsidiary of the bank Wells Fargo & Co. *See* Affidavit of Joshua P. Ritz ("Ritz Aff.," ECF 55-7) ¶ 4.[3] Joshua P. Ritz, the Regional Brokerage Manager for the Greater Maryland Region for WFA, Ritz Aff. ¶ 3, was Adams's supervisor from January 1, 2011, until her employment was terminated on March 28, 2011. *Id.* ¶ 9.

WFA "provides a wide range of investing advice, investment products, and portfolio management services" to its clients. *Id.* It employs over 15,000 financial advisors, who work in one of two "sales channels." *Id.* The sales channel with the "more traditional and familiar brokerage environment" is called the "Private Client Group." *Id.* ¶ 5. The other channel, in

---

[2] I will set forth the relevant facts chronologically, with the exception of those facts related to Count X of the SAC, which I will set forth at the end of this section. The facts set forth are undisputed, unless otherwise noted. In any event, as required in the context of a motion for summary judgment, I have construed the facts in the light most favorable to plaintiff.

[3] Ritz submitted a second affidavit, attached as an exhibit to the Reply. ECF 58-1. I will refer to the second affidavit as "Ritz Aff. 2."

which plaintiff worked, is known as "Wealth Brokerage Services" ("WBS").  *Id.*  Financial

advisors in WBS "seek[] to better leverage [their] bank affiliation" by providing brokerage

services to customers at Wells Fargo & Co.'s bank branches.  *Id.* ¶¶ 5–6.  Thus, although the

financial advisor working in a particular bank branch is not an employee of the bank branch, she

"is to be seen as part of the team in that bank branch" and relies on internal referrals for part of

her book of business.  Deposition of Joshua P. Ritz ("Ritz Dep.," Motion Ex. 2, ECF 55-4) at 40;

*see also* Deposition of Stephanie Adams ("Adams Dep.," Motion Ex. 1).[4]

FAs are paid on a draw/commission basis.  Ritz Aff. ¶ 8.  Commissions are calculated as

a percentage of the revenue produced by the FA, and the percentage applied (known as the "grid

rate") is typically determined by the advisor's level of production.  *Id.*  Although FAs are assured

of a "minimum salary draw," any FA whose earned commission does not exceed the minimum

salary draw carries the deficit into the next month.  *Id.*  FAs generate revenue either by collecting

transaction fees on sales of financial products to clients or by charging clients an annual fee tied

to the value of the client's account.  *See* Deposition of Henry John Rose, a senior vice-president

at Wells Fargo Advisors ("Rose Dep.," ECF 55-5) at 6, 9–10.  According to Ritz, an FA with

more than two years of experience is expected to produce at least $20,000 of revenue for WFA

each month.  *See* Ritz Dep. at 48–49; *see also* Motion Ex. 10, ECF 55-12.

Adams worked as an FA in WFA's Baltimore region.  Until approximately October 2008,

she worked primarily out of the Perry Hall and Martin Plaza bank branches.  *See* Adams Dep. at

26–27.  Adams did not have a dedicated office space at Perry Hall, but she did have one at

---

[4] The Adams Deposition is not available via the Court's CM/ECF system, as it was filed only in paper format.  *See* Notice of Filing of Lengthy Exhibit (ECF 55-3).

Martin Plaza. *Id.* at 30–31.[5]   Around October 2008, Adams contacted her supervisor, Robert Carpenter, and asked to be transferred from the Martin Plaza branch because of a series of disagreements she had with the Martin Plaza store manager. *See* Adams Dep. at 37; *see* Deposition of Robert Carpenter ("Carpenter Dep.," ECF 55-6) at 49–50.   Carpenter was a regional manager at WFA, and was Adams's direct supervisor for a portion of the time relevant to this case. *See* Carpenter Dep. at 7.   Adams was reassigned from Martin Plaza to the Overlea bank branch. *Id.* at 33.

Despite receiving the requested transfer, Adams was unhappy with the Overlea branch, which she claims was in a "very low end area" with "very low potential . . . for any prosperous business." Adams Dep. at 39.   Initially, Adams complained because, unlike at Martin Plaza, she did not have a dedicated office space at the Overlea branch. *Id.* at 49–50.[6]   However, she was later provided with office space on the second floor of the building. *Id.* at 49.   Adams testified that the office space was "old" and a "disaster" but that, after a few months, "they agreed to put a chair and a desk, [a] nice one, fresh carpet, fresh paint, and fresh blinds in there." *Id.* at 50. Carpenter estimated that the cost of the renovation of a "separate suite" for Adams was between $20,000 and $25,000.   Carpenter Dep. at 51.   The office was completed by late 2008, and Adams had this private office until her termination on March 11, 2011.   Adams Dep. at 34–35.

---

[5] According to Ritz, "[i]t is not unusual for FAs to be 'floaters,' meaning they do not have their own dedicated offices, especially because WFA does not have control over space assignments in the physical bank stores." Ritz Aff. ¶ 7.

[6] As noted, the bank store, not WFA, determined whether an FA would have a dedicated office. Ritz Aff. ¶ 7.

Issues with Adams's job performance began to surface in late 2009.  On October 12, 2009, Adams received a written warning from Carpenter, which stated, ECF 55-17 (all spelling and grammatical errors in original):

> According to the facts, I received several calls over the past few months from Sean Dunphy District Manager and Cristy Kemp Branch Manager of the Perry Hall branch concerning your performance and lack of participation inside the branch this year.  As you know, expections for your position requires you to be working with the Perry Hall Store on a daily basis.  The lack of participation in call nights, referrals and being readily available for appointments have hampered the branchs performance this year.   The branch has called you on many occassions with no resonse for days and is concerned that you are not focused on the job.  You have been given initail warnings verbally about these matters with no improvement.   This memo serves as a written warning and needs to be adhereded to or you could face disciplianary action up to termination of your employemnet with the company.

Around the same time, Adams informed Carpenter that she has bipolar disorder and attention deficit disorder.  *See* Adams Dep. at 54–56.  Adams also spoke with Carpenter multiple times over the next several months about her performance issues.  Adams Dep. at 74, 76.  But, the performance issues continued: Adams failed to meet the minimum revenue standard of $20,000 in February, March, and April 2010.  Motion Ex. 10, ECF 55-12.

On June 4, 2010, Adams filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Motion Ex. 19, ECF 55-21 ("EEOC Charge").  Although Adams checked boxes indicating that she suffered discrimination on the basis of sex, age, disability, and national origin, her description of the alleged discrimination focused only on sex discrimination.  In particular, Adams alleged that, when she was transferred from Martin Plaza to Overlea, "Carpenter mandated that [she] turn over ½ of [her] investor customers to that young male advisor who replaced [her].  However, the male advisor that [she] replaced at [Overlea] was not required by Carpenter to leave ½ of his book of investor clients to [her]."  EEOC Charge at 1.

Further, she alleged that Carpenter "never allocated or assigned any accounts to [her] to manage," but that Carpenter "consistently assigns . . . customer accounts to male financial advisors, many with less experience and seniority." *Id.* The EEOC charge eventually resulted in a mediated settlement between Adams and WFA, described *infra*.

On June 16, 2010, Carpenter issued a "Formal Warning for Unsatisfactory Performance" to Adams and placed her on a Performance Improvement Plan ("PIP"). Motion Ex. 10, ECF 55-12. In the warning, Carpenter noted Adams's repeated failure to meet the minimum revenue standard of $20,000 per month and observed that Adams is "not regularly in the office and [has] failed to follow the activities [she] developed in [her] business plan or with [her] store partners." *Id.* Carpenter advised that he "need[ed] to see immediate and ongoing improvement" in Adams's revenue production, time spent in the bank branches, efforts to generate business, and fostering of relationships. *Id.* He also wrote, *id.*:

> This letter serves as notice of a 90 day performance improvement plan. Your average trailing 3 months of production must exceed the minimum production level for three consecutive months. Failure to meet this performance expectation . . . may result in continuance of the corrective action process up to and including termination.
>
> I will review your results and your business plan with you every 30 days and continue work with you to help you meet your production minimum. Although you and I meet to review your plan and production, you are ultimately the one responsible for meeting your production minimum.

Adams produced $11,927 in revenue in June, $19,413 in July, and $32,955 in August. Because Adams failed to meet the minimum production requirement in two of the three months of the PIP, Carpenter issued a new formal warning on September 28, 2010, which was similar in substance to the previous warning. Motion Ex. 11, ECF 55-13.

In November 2010, Carpenter resigned from WFA. Carpenter Dep. at 8. He was temporarily replaced by Rose, who testified that he often fills in for departed managers until a permanent replacement is hired. Rose Dep. at 6. At her deposition, Adams testified that Rose is "a really good man" who was "positively oriented" with her in discussions about her work performance. Adams Dep. at 220. After a meeting with Rose, Adams emailed B.J. Renner, a Vice President at WFA, writing that Rose "was a real pleasure to meet with." Motion Ex. 17, ECF 55-19. However, she also wrote that she was facing financial struggles in her personal life and that she has "no incentive now to call customers and perform" because she was "continually paying back on a [$17,000] penalty." *Id.* The penalty to which she referred resulted from a complaint filed against Adams by a former client. *See* Motion Ex. 13, ECF 55-15.

Also in November 2010, Adams engaged in e-mail discussions with WFA Employee Relations Consultant Katherine Lindholm to determine what, if any, reasonable accommodations were available for Adams's alleged disabilities. *See* Motion Ex. 18, ECF 55-20. Among other things, Adams requested a transfer to a bank branch in Abingdon with "a permanent FA office" and that she be permitted to work from home on Mondays. *See id.* at 2. Adams explained in her deposition testimony that she required her own private office space "[b]ecause when you have bipolar, you really do need to focus on your job," and the noise and lack of privacy of working as a "floater" was too much of a distraction. Adams Dep. at 56; *see* SAC ¶ 14 ("Because of her disability, Adams could not stay focused while working or meeting with clients in the wide open atmosphere . . . ."). On November 19, 2010, Lindholm advised Adams, *id.* at 1:

> Your accommodation request to work from home one day a week has been reviewed by Compliance and is not feasible; however Accommodations Management will be in contact with you to continue the dialog [sic] on your request and to discuss other options for an accommodation.

As for the branch assignments, you are still assigned to the Perry Hall branch and should continue to work with your partners to meet with clients on their investment needs.  As I discussed with you in August, September and our conversation earlier this week, there is no real estate space for you to have a full time office in Perry Hall. The Overlea branch is where you will continue to have your desk and file space. As to your request to move to the Abingdon branch, there is no additional need for another Financial Advisor.

I have spoken with your management on the concerns you indicated in your email regarding the current deficit . . . .  Management has agreed to work with Finance to remove the additional deficit of $4,700, so that you will have a "clean slate" in that regard.

On December 22, 2010, Adams and WFA reached a mediated settlement agreement on Adams's EEOC charge.  The agreement is embodied in a Confidential Settlement and General Release Agreement, which Adams signed on January 7, 2010.  *See* Motion Ex. 13, ECF 55-15 ("Settlement Agreement").  Adams, who was represented by her current counsel in connection with the settlement, agreed to release all claims relating to her employment at WFA up to the date of the Settlement Agreement.  *Id.* at 3.  In exchange, WFA agreed, *inter alia*, to pay Adams $75,000; to extinguish Adams's commission deficit for the year 2010, in excess of $6,000; and to amend a Form U-4 on which WFA had noted a prior customer complaint against Adams.  *Id.* at 1; *see* Motion Ex. 21, ECF 55-23.  WFA did not admit to any wrongdoing, however.  Settlement Agreement at 3.

The Settlement Agreement contains a paragraph entitled "Payment of Commissions," which is at the heart of the dispute regarding Count I of plaintiff's SAC.  The paragraph provides, *id.* at 1–2:

The Firm will compensate Adams at a monthly grid of 33% starting with the January 1, 2011 commission month through and including the March 2011 commission month, at which point the Firm will compensate Adams at the monthly grid rate determined by her annualized revenue pursuant to the FA Compensation Plan and/or policies.

- 8 -

Other provisions in the Settlement Agreement are also pertinent.  The Settlement Agreement states that "[n]o branch reassignments are being made as a result of or in connection with this settlement agreement"; that WFA would request that the Perry Hall bank branch provide her with office space but that WFA "does not control whether [Perry Hall] will provide such an arrangement"; and that, "[t]o the extent that Adams believes that she is disabled and needs reasonable accommodations, Adams will pursue such accommodations through the Firm's Accommodations Management office."  *Id.* at 2.  It continues, *id.*: "Such requests for accommodations, however, shall not include those accommodations already denied by the Firm, which included a request to work from home and a change of branches."

Ritz became Adams's new manager on January 1, 2011.  Ritz Aff. ¶ 9.  During his time as manager, Ritz asked his "entire FA team to begin thinking about their business planning for 2011, and what they would like to accomplish."  *Id.*  He also "also established bi-weekly conference calls with [his] entire FA team."  *Id.*  However, according to Ritz, "Adams did not take advantage of [his] suggestions on business planning, and she did not regularly attend the team conference calls."  *Id.*  Ritz sent several other e-mails to his team of FAs suggesting that they attend conference calls and notifying them of training opportunities, but according to Ritz, Adams did not take advantage of these opportunities.  *See id.* ¶¶ 10–13; Motion Ex. 28, ECF 55-30 ("You have been invited to my [bi-weekly] team conf calls; from my role [sic] call on record you have not attended.").

Between January and March 2011, Adams corresponded with Jan Coddington Frame, an Accommodations Management Specialist at Wells Fargo & Co., about Adams's request for an exclusive office or private cubicle space at Perry Hall.  *See* Affidavit of Jan Coddington Frame

("Frame Aff.," ECF 55-10) ¶ 4.  However, Frame advised Adams that "there were no longer offices in the Perry Hall branch and that no dedicated cubicle space was available at the crowded branch."  *Id.* ¶ 5.

On February 22, 2011, Ritz sent an e-mail detailing his team's monthly revenue production.  Motion Ex. 29, ECF 55-31.  Adams's month-to-date production was $6,107.04, which ranked her 20th among the 23 FAs listed.  *Id.*  In response, Adams wrote, *id.*: "I need to get in gear…..I GOTTA!!!!!!  I have had so many issues with Caroline my eldest...I will talk with you about it all some time…but I do have some good leads in the hopper…Thank you for your patience…I am also working with accommodations…"  In response, Ritz asked Adams what she meant by "accommodations" and requested that Adams send him "some basic info" about her lead opportunities.  Motion Ex. 31, ECF 55-33.  Adams replied that she did not know whether she was "at liberty to discuss this with [Ritz] due to confidentiality issues," but that her doctor was working with the "accommodations unit."  Motion Ex. 32, ECF 55-34.  Further, she advised that she had "set up a dinner" with the bankers at Perry Hall and Overlea, scheduled a meeting with a client, and had "about 300k in the pipeline so far this month."  *Id.*  She also requested "some planning assistance" from Ritz and stated that she would like to "get to know [him] better."  *Id.*

Ritz visited the bank branches at Perry Hall and Overlea on March 10, 2011.  Ritz Aff. ¶ 13.  Adams was not present at either location.  *Id*.  Kristy Kemp, the Store Manager at Perry Hall, told Ritz "that she had not seen Adams at all during 2011" and that "over the past year calls to Adams were not returned for days, and that Adams was generally unavailable to assist the branch as an FA."  *Id.; see also* Affidavit of Kristy Kemp, Motion Ex. 6, ECF 55-8 (confirming

that Adams was not present during 2011, and she had only seen Adams four or five times in the prior year).  Similarly, Carol Burleigh, the Store Manager at Overlea, told Ritz that "she did not see Adams frequently, and that she also did not see Adams at all during 2011."  Ritz Aff. ¶ 13; *see* Affidavit of Carol Burleigh, Motion Ex. 9, ECF 55-11 (confirming that Adams was frequently absent).  According to Ritz, "it seemed evident . . . that Adams was not working."  Ritz Aff. ¶ 13.

Later that day, Ritz wrote an e-mail to Adams.  He asked Adams to send him data about her pipeline, inquired whether Adams had planned any activities other than the dinner she previously referenced, and asked whether Adams had worked on her 2011 business plan.  Motion Ex. 45, ECF 55-47.  Adams replied the following day.  *Id.*  She explained that she was out of the office the previous day because she was "battling with a bad kidney stone," described her plans for her book of business going forward, and expressed optimism about the future.  *Id.*  Ritz responded the next day, stating: "Good to hear the news and activities that you see coming in the future with your book and your store partners."  *Id.*

On March 18, 2011, Ritz sent an e-mail to his FAs about their March production status.  Motion Ex. 46, ECF 55-48.  As of that date, Adams had produced $3,736.22 in revenue for the month and $19,740.10 for the year; her monthly revenue ranked her 20th out of the 21 FAs listed, and her yearly revenue was the lowest of the 21 FAs.  *Id.*  After sending the e-mail, Ritz contacted Human Resources and learned that "Adams had been subject to performance improvement plans since October 2009" and that "[s]he repeatedly had been warned about producing a minimum of $20,000 a month and about the need to be present in her assigned stores during regular business hours."  Ritz Aff. ¶ 15.  Ritz concluded that Adams's "production had

not improved since October 2009, and she had made no reasonable effort to improve." *Id.*

"Approximately ten days later, [Ritz] terminated Adams for failing 'to meet job performance

expectations.'" *Id.*

In conjunction with the termination, WFA completed a Form U-5 (Uniform Termination

for Securities Industry Registration), as required by the Financial Industry Regulatory Authority

("FINRA").[7]   Motion Ex. 48, ECF 55-50.   WFA reported that Adams was discharged because

she "failed to meet job performance expectations." *Id.*

Count X of the SAC relates to WFA's bonus program, "4Front Client Service and

Loyalty Program," which was launched in 2009.  *See* Motion Exs. 51–54, ECF 55-53–56.  The

4Front program encouraged FAs, through financial incentives, to create long-term financial plans

for their clients.  The stated purpose of the 4Front Program was to increase client satisfaction and

loyalty.  *See* 4Front Client Service and Program Business Rules, ECF 55-54.

To earn a bonus under the 4Front Program, FAs were required to develop and present a

financial plan to at least 25 clients (or households), each of whom had to have $250,000 or more

invested with WFA.  *See* ECF 55-54; Adams Dep. at 186; Rose Dep. at 11, 33–34.  FAs used

software called "Envision" to create these financial plans.  Rose Dep. at 11–13.  Once an FA

created and presented a plan to the required 25 households, accepted by WFA, she was required

---

[7] "The Form U-5 is the standard form used in the securities industry to report the termination of a registered representative's association with a broker-dealer. The form was developed jointly by the staffs of the SEC, the National Association of Securities Dealers, Inc. ("NASD"), the North American Securities Administrators Association ("NASAA"), and the various securities exchanges. NASD rules require that member firms file the form within thirty days of an individual's termination and update the form within thirty days of learning any information that renders the original filing inaccurate.[] The NASD also requires member firms concurrently to provide terminated individuals with a copy of their Form U-5 and any amendments thereto.[]" Anne H. Wright, *Form U-5 Defamation*, 52 Wash. & Lee L. Rev. 1299, 1303 (1995).

to continue monitoring the financial plans she had created.  For example, the FA was required to review and update the plan annually, to present the plan to the client on an annual basis, to generate annual progress reports, to maintain the number of qualifying households, and to have "six proactive conversations with the client."  *See* ECF 55-54; Adams Dep. at 189–91.  The 4Front bonus required FAs to maintain a long-term standard of care and ongoing responsibilities for nine years.  *See, e.g.,* Adams Dep. at 189–97; *see* Rose Dep. at 16.

Employees who met the criteria of the 4Front Program were eligible to receive a cash bonus award from WFA, "payable in 108 equal monthly installments," beginning with the September 2010 revenue month and continuing through August 2019, *i.e.*, a nine-year period. *See* 4Front Agreement, Motion Ex. 51, ECF 55-53 at 2.  The 4Front Agreement explains that receipt of monthly award payments "is conditioned upon [the FA] meeting all the criteria under the program and [his/her] continued active employment in good standing with [WFA] and holding the functional title of Financial Advisor."  *Id.*  Alternatively, qualifying employees were permitted to receive a lump sum award as an advance, secured by a promissory note.  *See* "Loan Option at a Glance," Motion Ex. 54, ECF 55-56.  Employees who opted for the lump sum would still receive monthly bonus payments, but were expected to use the monthly bonus payments to pay off the principal and interest on the note.  *Id.*

The last date for an FA to submit financial plans created for the 4Front Program was June 30, 2010.  Rose Dep. at 34.  For the quarter ending June 30, 2010, Adams submitted 50 households on the Envision software for the 4Front Program.  Motion Ex. 55, ECF 55-57. However, at some point after Adams made her entries, Carpenter entered a notation into the Envision system that he was "skeptical on these plans.  It looks like that at least 40% were

fabricated or not complete."  Opp. Ex. 4, ECF 57-6.  He also wrote that "in most cases we found that the plan was never presented to the client.  [Adams] had called and asked questions but never presented the findings of the plan or went through the financial planning process."  *Id.* And, Carpenter "declined" approximately half of the entries before approving the remainder of the report.  *Id.*

The report was initially approved at the next level of review, but the report later "caught the attention" of WFA staff because of the volume of activity in the month of June.  *Id.* Specifically, Adams's entries reflected that she had presented 43 of the plans to clients in the month of June alone.  As Rose put it: "When brokers had a year and a half to do plans and when you do 43 of them in the last month, it raises a flag."  Rose Dep. at 32.  Moreover, according to Adams's entries into the Envision software, Adams had presented 18 plans to clients on a single day, June 11, 2010.  This raised suspicions because the client presentations, done properly, normally took "at least an hour."  *Id.* at 25.

On February 2, 2011, Michael Ward, who was responsible for processing the reports submitted by FAs for the 4Front Program, e-mailed Rose about Adams's entries, stating that "we are going to have to dig deeper to get these plans approved because of the comments [Carpenter] entered into the system."  Motion Ex. 56, ECF 55-58.  Rose testified that a compliance officer then reached out to ten clients for whom Adams claimed to have created a plan; "half of the clients said they were not involved in the process."  Rose Dep. at 17.  Rose himself called three clients; "two received the plans and one didn't."  *Id.* at 17, 37.  But, Rose testified that the plans "were reasonable plans" for Adams's "long-term clients," and that Adams was knowledgeable about her clients.  *Id.* at 17.

On February 7, 2011, Rose e-mailed Adams to advise her that her 4Front plans were under further review.   Motion Ex. 58, ECF 55-60.   Rose explained that her plans raised suspicions "because 21 plans were created during the last 3 days of June."  *Id.*  He asked Adams to send him and Ritz "an email of the process [she] used in gathering the information" and "how and when [she] delivered and discussed the plans with the clients."  *Id.*  He also asked Adams for any notes or calendars that she had to document her discussion with the clients.  *Id.*  Rose repeated the same request on February 14, 2011, *see id.*, and Adams replied on February 23, 2011.  Motion Ex. 59, ECF 55-61.  She explained that the fifty entries were for customers she has "worked with for many years," that the reviews "were mostly conducted over the phone," and that she was facing a series of personal challenges at the time that the entries were made.  *Id.*

Further investigation ensued and, according to Ward, approximately 20 entries were eventually declined.  Opp. Ex. 4.  However, before the report was finally approved with the remaining 30 entries, Adams's employment was terminated.  She was never paid any bonus under the 4Front program.

Additional facts are included in the Discussion.

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex Corp.*, 477 U.S. at 322–24. Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 248. In other words, "[f]actual disputes that are irrelevant . . . will not be counted." *Id.*

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. For Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). Moreover, in resolving a summary judgment motion, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

Fed. R. Civ. P. 56 "is a mechanism to obviate trial . . . ." *Boyer-Liberto v. Fontainbleau Corp.*, ____ F.3d ____, No. 13-1473, slip op. at 9 (4th Cir. May 13, 2014). As the Fourth Circuit recently observed, "'the very mission of the summary judgment procedure is to pierce the pleadings and <u>to</u> assess <u>the</u> <u>proof</u> in order to see whether there is a genuine issue for trial.'" *Id.*, slip op. at 8-9 (quoting Advisory Committee's Notes to Fed. R. Civ. P. 56) (emphasis added in *Boyer-Liberto*). In supporting or opposing summary judgment, a party must rely on facts that

would be admissible at trial.  *Id*. at 9.  If "the evidence is such that a reasonable jury could return

a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.

*Anderson,* 477 U.S. at 248.  In contrast, a court must award summary judgment if the evidence

"is so one-sided that one party must prevail as a matter of law."  *Id*. at 252.  And, "the mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff."  *Id*.  Of import here,

the court should "prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## Discussion

### Count I: Breach of Contract

In Count I, plaintiff alleges breach of contract, *i.e.*, the Settlement Agreement.  The claim

for breach of contract arises under state law.  Federal courts with supplemental jurisdiction over

a state law claim apply the choice of law rules of the forum state.  *Klaxon Co. v. Stentor Elec.*

*Mfg. Co.,* 313 U.S. 487, 496–97 (1941).  Maryland is the forum state, and its law governs this

Court's choice-of-law analysis.  *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d

678, 696 (D. Md. 2011).  Under Maryland law, "the parties to a contract may agree as to the law

which will govern their transaction."  *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F.

Supp. 2d 505, 517 (D. Md. 2011) (internal quotation marks omitted).  The Settlement Agreement

contains a choice of law provision that stipulates to the application of Maryland law.  *See*

Settlement Agreement ¶ 28.  Moreover, the parties' submissions presuppose the application of

Maryland law.  Accordingly, I will apply Maryland law here.

Adams's contract claim centers on the "Payment of Commissions" paragraph of the Settlement Agreement, which provides, ECF 55-15 at 1–2:

> The Firm will compensate Adams at a monthly grid of 33% starting with the January 1, 2011 commission month through and including the March 2011 commission month, at which point the Firm will compensate Adams at the monthly grid rate determined by her annualized revenue pursuant to the FA Compensation Plan and/or policies.

Adams alleges that the above-quoted provision created an "implied in fact condition of continued employment through April, 2011." Opp. at 13. She contends that WFA breached that condition by terminating her employment on March 28, 2011, thereby "failing to provide an opportunity for employment at least during April, 2011 at her grid rate determined by annual production." SAC ¶ 40. WFA disagrees, arguing that Adams was an at-will employee and that the Settlement Agreement did not change that status; rather, it "established only the rate at which Adams would be paid." Memo at 28. In WFA's view, the Settlement Agreement "did not require WFA to employ Adams for a specific period of time, change the at-will nature of her employment, and/or alter her duties or production requirements." *Id.*

WFA relies primarily on the law of at-will employment. Employment in Maryland may either be for a fixed term pursuant to a contract of definite duration, or at will. *Hrehorovich v. Harbor Hospital*, 93 Md. App. 773, 790, 614 A.2d 1021, 1030 (1992), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993). An employment agreement is deemed at will, if it does not expressly specify a particular time or event terminating the employment relationship. *Id.*; *see also Molesworth v. Brandon*, 341 Md. 621, 69-30, 672 A.2d 608, 612 (1996); *Shapiro v. Massengill*, 105 Md. App. 743, 745, 661 A.2d 202, 208, *cert. denied*, 341 Md. 28, 668 A.2d 36 (1995); *Staggs v. Blue Cross of Md., Inc.*, 61 Md. App. 381, 388, 486 A.2d 798, 801, *cert. denied*, 303

Md. 295, 493 A.2d 349 (1985).  The employment at-will doctrine provides that "'an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time,'" without cause, and without giving rise to a cause of action for breach of contract, so long as the termination was not for an illegal reason.  *Parks v. Alpharma, Inc.*, 421 Md. 59, 73, 25 A.3d 200, 208 (2011) (quoting *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981)); *see Samuels v. Tschechtelin*, 135 Md. App. 483, 526, 763 A.2d 209, 232 (2000).

Under Maryland law, employment is presumptively at-will.  *Towson Univ. v. Conte*, 384 Md. 68, 79, 862 A.2d 941, 947 (2004).  However, the presumption of at-will employment "'can be overcome by express or implied terms which show that the parties clearly intended to create a binding relationship for a specific period of time or until certain conditions occur.'"  *Goode v. Am. Veterans, Inc.*, 874 F. Supp. 2d 430, 450 (D. Md. 2012) (quoting Mazaroff, *Maryland Employment Law* § 3.2 at 166 (1990)); *see University of Baltimore v. Iz*, 123 Md. App. 135, 171, 716 A.2d 1107, 1125, *cert. denied*, 351 Md. 663, 719 A.2d 1262 (1998).

In WFA's view, the Settlement Agreement does not evince a clear intent to create a binding relationship for a specific or fixed period of time because it only speaks to Adams's rate of compensation, rather than the length of her employment.  *See* Memo at 27–28.  In support of that position, WFA cites, *inter alia*, *Lubore v. RPM Associates, Inc.*, 109 Md. App. 312, 326, 674 A.2d 547, 554, *cert. denied*, 343 Md. 565, 683 A.2d 177 (1996).  In that case, the Maryland Court of Special Appeals ruled that an employment contract's projection of compensation for the first two years of the appellant's employment did not guarantee the appellant employment for those two years.  *See also Gill v. Computer Equip. Corp.*, 266 Md. 170, 179, 292 A.2d 54 (1972)

("It is also well settled that a hiring at so much a week, month or year, no time being specified, does not, of itself, make more than an indefinite hiring.").

Adams does not challenge the basic principles of at-will employment relied upon by WFA. Rather, she avers that those principles apply only in the context of hiring agreements, *i.e.*, "agreements created in contemplation of hiring the subsequently aggrieved party." Opp. at 14. In Adams's view, the cases cited by WFA are inapposite because Adams's case "has nothing to do with hiring"; rather, it concerns an entirely separate Settlement Agreement pursuant to which Adams gave up her right to pursue a civil suit against WFA in exchange for "guaranteed compensation and the necessary, implied in fact condition of continued employment for at least four months to provide opportunity for her to generate income that she felt had been wrongfully denied her for discriminatory reasons." Opp. at 14–15.

An agreement to settle a lawsuit is governed by general contract principles. *See Creamer v. Helferstay*, 294 Md. 107, 119–122, 448 A.2d 332, 338–340 (1982); *Nationwide Mut. Ins. Co. v. Voland,* 103 Md. App. 225, 231, 653 A.2d 484, 488 (1995). By analogy, those principles would apply here. The parties resolved their disputes in accordance with the terms of the Settlement Agreement, in lieu of litigation.

Even if Adams was an at-will employee when she was hired, the parties to a settlement agreement can alter an at-will employment arrangement in exchange for the employee's willingness to relinquish her right to pursue a judicial remedy based on a claim of alleged discrimination. Or, the parties can change a specific term to at-will status. *See Corsair Special Situations Fund, L.P. v. Engineered Framing Sys., Inc.*, 694 F. Supp. 2d 449, 454–55 (D. Md. 2010) ("'A settlement agreement is a contract which the parties enter into for the settlement of a

previously existing claim by a substituted performance.'") (quoting *Hyundai Motor Am. v. Alley*, 183 Md. App. 261, 960 A.2d 1257, 1262 (2008))), *aff'd*, 442 F. App'x 66 (4th Cir. 2011).   The effect of the Settlement Agreement on the parties' relationship here is a question of contract interpretation.

Under Maryland law, "'[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions.'"   *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14, 891 A.2d 336, 344 (2006)); *see Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, Inc.*, 376 Md. 157, 166, 829 A.2d 540, 546 (2003).   To determine the parties' intentions, courts first look to the written language of the contract.   *Id.*   "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'"   *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632–33 (2003) (quoting *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001)).

When a contract's language is clear and unambiguous, "its construction is for the court to determine."   *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 251, 768 A.2d 620 (2001); *see DIRECTV, Inc.*, 376 Md. at 312, 829 A.2d at 632 ("[W]here the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court.").   A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean.   *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737 (2006); *PaineWebber Inc. v. East*,

363 Md. 408, 414, 768 A.2d 1029 (2001); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444 (1999).

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006). "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods,* 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.,* 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.,* 966 F.2d 1443, 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

A "contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 167, 829 A.2d 540, 547 (2003); *see Cochran v. Norkunas*, 398 Md. 1, 17, 919 A.2d 700, 710 (2007); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444–45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999).  To determine whether a contract is ambiguous, the court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985); *see Young v. Anne Arundel Cnty.*, 146 Md.App. 526, 587, 807 A.2d 651, 687 (2002), *cert. denied,* 372 Md. 432, 813 A.2d 259 (2002); *Iz, supra*, 123 Md. App. at 162, 716 A.2d at 1121.

"If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010). "'If, however, resort to extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'" *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 526 (D. Md. 2012) (quoting *Wash. Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007)).

In my view, the language of the Settlement Agreement is subject to more than one reasonable interpretation. On the one hand, a reasonable person could adopt plaintiff's interpretation. The paragraph in question uses imperative language in providing that WFA "*will* compensate Adams at a monthly grid of 33% . . . through and including . . . March 2011," without qualification or reservation. *See* Settlement Agreement at 1–2 (emphasis added). In order for WFA to fulfill its promise to pay Adams a certain percentage of revenue she brings in, WFA would have to allow her to continue bringing in revenue. Similarly, the paragraph states that Adams will be compensated at a 33% grid rate "through and including . . . March 2011 . . . , *at which point* [WFA] *will* compensate Adams at the monthly grid rate determined by her annualized revenue . . . ." *Id.* (emphasis added). This phrasing arguably provides that WFA agreed to employ Adams for at least a month after March 2011, and to compensate her for that month at the monthly grid rate determined by her performance.

Moreover, the promise to pay Adams at 33% commission, for which WFA received consideration, would be illusory if WFA could escape its obligations simply by terminating Adams's employment.   Indeed, WFA's interpretation would permit it to terminate Adams's employment immediately after signing the Agreement, thereby depriving Adams of all benefit of the "Payment of Commissions" provision.   This interpretation would violate the "well-established rule of construction that a contract should be interpreted in its entirety such that a court does not dismiss or disregard any clause or phrase as meaningless." *Kendall v. Nationwide Ins. Co.,* 348 Md. 157, 169, 702 A.2d 767 (1997).   Accordingly, a reasonable person could interpret the provision as including an implied-in-fact term that WFA will keep Adams employed at least through the end of March 2011, and perhaps longer.   And, because Adams was fired on March 28, 2011, i.e., before March 31, 2011, a reasonably jury could conclude that WFA breached the provision.

On the other hand, WFA's interpretation is also reasonable.   If the parties intended to guarantee Adams continued employment through a certain date, they easily could have said so in the Settlement Agreement.   Yet, the Settlement Agreement does not expressly guarantee Adams's continued employment through a specified date.   In this regard, Adams may have gambled on her own performance; that is, rather than negotiate for guaranteed employment through March 2011 or beyond, she negotiated for a higher commission rate and endeavored to perform at a level that met WFA's standards.

WFA's position also appears reasonable in light of the fact that plaintiff's contrary position becomes absurd when taken to its logical extreme:   If plaintiff is correct that the provision's language that WFA *will* compensate Adams at 33% commission through March 2011

guarantees Adams continued employment through March, then it would follow that the language

that, after March 2011, WFA "*will* compensate Adams at the monthly grid rate," without any

specified endpoint, guarantees Adams continued employment for all of time after March 2011.

Yet, the Settlement Agreement surely does not guarantee Adams indefinite employment.

Finally, the illusory contract problem is at least partially overcome by the fact that

Adams's termination did not deprive her of the entirety of her benefit of the bargain. Rather,

even under WFA's interpretation, the Settlement Agreement guaranteed her $75,000 and her

desired amendment to the Form U-4.

For these reasons, I find that the language of the Settlement Agreement is ambiguous as

to whether it prohibits WFA from terminating Adams's employment prior to a particular date.

Accordingly, I may consider extrinsic evidence to determine the parties' intent. *See Cnty.*

*Commissioners of Charles Cnty.*, 366 Md. at 445, 784 A.2d at 556.

The parties do not cite any extrinsic evidence that they believe resolves the ambiguity.

But, my review of the exhibits reveals information that supports each parties' interpretation.

Cutting in favor of WFA's interpretation is that, at the time of the Settlement Agreement, Adams

already had been formally warned about her inadequate revenue production and placed on a

Performance Improvement Plan. *See, e.g.*, ECF 55-12. The Settlement Agreement did not

purport to modify the PIP or the revenue production requirements the PIP imposed. The parties'

decision not to address the PIP in the Settlement Agreement suggests that the parties intended the

PIP to remain in effect and the benefits of the "Payment of Commissions" provision to be

contingent on Adams's compliance with the PIP's terms.

On the other hand, cutting in favor of Adams's interpretation is that her EEOC Charge alleged that Carpenter had, for discriminatory reasons, damaged Adams's revenue production by requiring her to turn over ½ of her clients to another FA. *See* EEOC Charge at 1. Accordingly, the parties may have intended to remedy that harm by providing Adams time to rebuild her book of business before holding her to the standards previously set forth in the PIP.

Because resort to extrinsic evidence does not clarify the parties' intent, "summary judgment must . . . be refused and interpretation left to the trier of fact." *Basile*, 875 F. Supp. 2d at 526 (quotation marks omitted). Accordingly, I will deny the Motion with respect to Count I of the SAC.

### Counts II–III: Sex Discrimination

Adams alleges that "Wells Fargo and its agents engaged in unlawful gender discrimination and systematically denied equal employment opportunities to Ms. Adams on the basis [of] her gender," in violation of both Title VII and the MFEPA. SAC ¶¶ 45, 51.[8] Title VII prohibits an employer from, *inter alia*, discriminating against an individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Boyer-Liberto*,

---

[8] MFEPA "is the state law analogue of Title VII." *Alexander v. Marriott Int'l, Inc.*, Civ. No. RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011). Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority. *See, e.g., Taylor v. Giant of Maryland, LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766 (1990); *Md. Shipbuilding & Drydock Co., Inc. v. Md. Comm'n on Human Rel.*, 70 Md. App. 538, 545-50, 521 A.2d 1263 (1987); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013). And, plaintiff has not asserted a distinction between her federal and state sex discrimination claims. Accordingly, I will apply the same standards to my analysis of plaintiff's state and federal law sex discrimination claims. *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012).

*supra*, slip op. at 11; *Freeman v. Dal-Tile Corp.*, No. 13-1481, slip op. at 13 (4th Cir. May 1, 2014).

In general, there are "two avenues" at trial by which a plaintiff may prove that an adverse employment action amounts to intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original). Adams has not produced any direct evidence of sex discrimination.

The second avenue available to the plaintiff is to follow the burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Nevertheless, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n. 2 (4th Cir. 1989) (citation omitted).

Under the *McDonnell Douglas* proof scheme, the plaintiff at trial must first establish, by a preponderance of the evidence, a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Laing v. Fed. Exp. Corp.*,

703 F.3d 713, 719 (4th Cir. 2013).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n. 13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  For example, the Fourth Circuit has framed the prima facie case as: "1) membership in a protected class; 2) satisfactory job performance; 3) adverse employment action . . . ; and 4) that similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 295 (4th Cir. 2004); *see also Gerner v. County of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).[9]  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant" and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11.  Stated another way, if the employer

---

[9] In cases where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, it is a common practice to assume, without deciding, that the plaintiff has established a prima facie case. *See, e.g., Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319–20 (4th Cir. 2005); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp.2d 729, 736–37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983).

When the defendant meets his or its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

The relevance of the *McDonnell Douglas* scheme outside of the trial context is limited, however.  The Fourth Circuit has admonished district courts at the summary judgment stage to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). Further, the Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'"  *Id.* at 294–95 (citation omitted); *see, e.g., Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510 (4th Cir. 2006).

In the Settlement Agreement, Adams waived her right to pursue most of her allegations of sex discrimination. And, she has failed to offer any support for the allegations that remain. I explain below.

Adams filed a charge of discrimination with the EEOC on June 4, 2010. In the EEOC Charge, Adams alleged that Carpenter assigned half of her book of business to a male FA who replaced her at the Martin Plaza branch; assigned larger branches and customer accounts to male FAs; and assigned business and customers to male FAs, as opposed to her. ECF 55-21. On January 7, 2010, Adams and WFA reached a Settlement Agreement with respect to Adams's claims. In exchange for various forms of compensation, Adams waived her right to pursue certain claims against WFA arising prior to January 7, 2010. The Settlement Agreement states, ECF 55-15 at 2–3:

> Adams . . . finally and forever releases and discharges [WFA] . . . from any and all claims and rights of any kind that she has or may have . . . arising out of or in any way connected with her employment at [WFA], from the beginning of time until the date this Settlement Agreement is executed. These claims and rights include, but are not limited to, . . . claims under Title VII of the Civil Rights Act of 1964, . . . The Americans With Disabilities Act, . . . and all other claims under any other federal, state, or local law.

In the SAC, Adams repeats the allegations against Carpenter that formed the basis of her EEOC Charge. *See* SAC ¶¶ 45a–b. But, in the Settlement Agreement, Adams waived her right to pursue a civil remedy on the basis of those allegations. *See* Settlement Agreement, ECF 55-15 at 2–3. Accordingly, those allegations cannot support a claim under Title VII or Maryland law.

The SAC also alleges that sex discrimination occurred after the date of the Settlement Agreement. SAC ¶ 45c states: "WFA den[ied] [Adams] critical resources that affect FA income while providing same to male FA's, including insurance licensing, office or cubicle space, and

managerial assistance in production plan development, between the period of January 7, 2011, and March 28, 2011." However, in her Opposition, Adams does not even attempt to support these allegations. She does not reference or cite a single post-settlement act of sex discrimination. Nor does she expand upon the SAC's vague reference to the alleged sex-based deprivation of "critical resources." Rather, Adams merely repeats the non-viable allegations about Carpenter's conduct.

In any event, the undisputed facts establish that Adams: was never denied licensing; had her own office at the Overlea branch; acknowledged that WFA could not guarantee her an "office or cubicle space" at the Perry Hall branch because WFA does not have control over such an arrangement; agreed to pursue any requests for reasonable accommodations through WFA's Accommodations Management office; agreed not to request reasonable accommodations relating to those already denied by WFA, which included a request to work from home and a change of branches; and never made any request for a reasonable accommodation after signing the Settlement Agreement.

In light of the complete lack of evidentiary support for Adams's allegations of post-settlement sex discrimination, no reasonable jury could return a verdict in her favor on Counts II or III of the SAC. *See Anderson*, 477 U.S. at 248. Accordingly, I will grant WFA's motion for summary judgment with respect to those counts.

*Counts IV–V: Disability Discrimination*

Adams alleges that, in violation of the ADA and the MFEPA, WFA failed "to take those measure[s] necessary to find reasonable accommodations when put on notice that [Adams] is suffering from a disability and requires such accommodations." SAC ¶¶ 57a, 63a.[10]

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). "One form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 322 (4th Cir. 2011). To prevail on a claim under the ADA for failure to accommodate, a plaintiff must make an initial showing "'that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations.'" *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) ((quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)). And, as a necessary corollary of the fourth requirement, the plaintiff must have communicated to her employer "a wish for accommodation of her disability." *Parkinson v. Anne Arundel Medical Center*, 79 Fed. App'x 602, 604 (4th Cir. 2003).

---

[10] The MFEPA contains provisions substantively identical to the provisions of the ADA that are relevant here. *McCullough v. Prince George's Cnty., Maryland*, Civ. No. AW-08-515, 2010 WL 723979, at *4 n.4 (D. Md. Feb. 24, 2010). And, plaintiff has not asserted a distinction between her federal and state disability discrimination claims. Accordingly, I will apply the same standards to my analysis of plaintiff's state and federal disability discrimination claims.

Plaintiff's claims of disability discrimination cannot survive summary judgment. As was the case with Adams's allegations of sex discrimination, most of her claims are foreclosed by the Settlement Agreement. As discussed, the Settlement Agreement served as a waiver by Adams of all claims, under any state or federal law, related to issues with WFA that occurred prior to January 7, 2010. Thus, to the extent that Adams's claims of disability discrimination are predicated on events that occurred before that date, those claims are not viable.

Adams's allegations of post-settlement discrimination also fail, as the record reveals that Adams did not make any request for accommodations after entering into the Settlement Agreement. The Settlement Agreement specifically addressed the issue of reasonable accommodation. It provided, ECF 55-15 at 2:

> To the extent that Adams believes that she is disabled and needs reasonable accommodations, Adams will pursue such accommodations through [WFA's] Accommodations Management office. Such requests for accommodations, however, shall not include those accommodations already denied by [WFA], which include a request to work from home and a change of branches.

According to Jan Coddington Frame's unchallenged affidavit, Adams did not make any request for reasonable accommodations to the Accommodations Management office after the date of the Settlement Agreement. *See* Frame Aff. ¶¶ 4, 7. Nor did Adams make any request for accommodations in her e-mail correspondence with Ritz, who was her supervisor for the period following the Settlement Agreement. *See, e.g.*, ECF 55-34. And, when Adams was asked at her deposition whether she made any post-settlement request for accommodations for her disability, she was unable to identify any such request. *See* Adams Dep. at 111–20. Because Adams did not request any reasonable accommodations, WFA could not have "refused to make such

accommodations." *Rhoads*, 257 F.3d at 387.  Therefore, no reasonable jury could conclude that plaintiff can make a *prima facie* showing of failure to accommodate.

For the foregoing reasons, I will grant summary judgment to WFA as to Counts IV and V of the SAC.

*Counts VI–VII: Retaliation*

In Counts VI and VII, Adams alleges that her employment was terminated in retaliation for filing discrimination charges with the EEOC and for subsequently obtaining relief for the alleged discrimination via the Settlement Agreement.  As a result, she alleges that defendant violated Title VII and the MFEPA.[11]

"Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights." *Thorn v. Sebelius*, 766 F.Supp.2d 585, 600 (D. Md. 2011).  The purpose of Title VII's antiretaliation provision is to "[m]aintain[] unfettered access to statutory remedial mechanisms" for employees who fear reprisal.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

In order to establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (citations omitted); *see Boyer-Liberto*, *supra*, slip op. at 18; Price *v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

---

[11] Plaintiff does not assert any distinction between her federal and state law retaliation claims.  Accordingly, I will analyze both under Title VII's standards.

A plaintiff's protected activity must be predicated on a reasonable belief that the employment practice in issue was unlawful. *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 338 (4th Cir. 2006); *see also Boyer-Liberto*, *supra*, slip op. at 18. The second element of the prima facie case for retaliation is an "adverse employment action." In a retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged employment action "materially adverse," which "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted). The action must be *materially* adverse because "it is important to separate significant from trivial harms." *Id.* The third element of the prima facie case, that the protected activity was causally connected to the employer's adverse action, requires a plaintiff to "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ___U.S. ___, 133 S. Ct. 2517, 2534 (2013).

"If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, *supra*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino,* 446 F.3d 541, 551 (4th Cir. 2006)); *see Smith v. Vilsack,* 832 F. Supp. 2d 573, 584 (D. Md. 2011) ("'[A] plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent.'") (citation omitted). In cases such as this one, where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, it is a common practice to assume, without deciding, that the plaintiff has established a prima facie case. *See, e.g.*, *Holland v. Washington Homes, Inc.*, 487

- 35 -

F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006);

*Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (*en banc*); *Diamond v. Colonial Life & Acc.*

*Ins. Co.*, 416 F.3d 310, 319–20 (4th Cir. 2005); *see also Geist v. Gill/Kardash P'ship*, 671 F.

Supp. 2d 729, 736–37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394

(D. Md. 2002).

Defendant contends that summary judgment in its favor is warranted because (1) Adams

cannot show a causal connection between her EEOC activity and her termination and (2) Adams

cannot establish that WFA's articulated reason for ending her employment (*i.e.*, her poor

performance and absenteeism) was a pretext for retaliation.  Memo at 37.  In accordance with

Fourth Circuit practice, *see supra*, I will assume that Adams can establish a prima facie case of

retaliation.  However, Adams has not proffered evidence from which a reasonable jury could

conclude that WFA's articulated reason for firing her was pretext for unlawful retaliation.

WFA has submitted ample evidence that Adams was not producing revenue at the rate

desired by WFA or at a rate commensurate with her peers.  For example, WFA's exhibits reveal

that Adams failed to meet the monthly revenue target of $20,000 in at least five months in 2010

and in each of the first three months of 2011.  *See* ECF 55-13; ECF 55-31; ECF 55-48; Ritz Aff.

¶ 15.  WFA also submitted evidence that Adams was subject to a Performance Improvement Plan

in several of the months during which she underperformed.  Those PIPs expressly stated that

failure to produce $20,000 per month in revenue "may result in continuance of the corrective

action process up to and including termination."  *See, e.g.*, ECF 55-12.  And, WFA submitted

evidence that Adams was absent from her assigned bank branches for long stretches of time.  *See*

Ritz Aff. ¶ 13; ECF 55-8; ECF 55-11.

WFA has articulated a legitimate, nondiscriminatory reason for terminating Adams's employment.  *See, e.g., Tavernier v. Health Mgmt. Associates, Inc.*, 498 F. App'x 349, 351 (4th Cir. 2012) (plaintiff's poor performance was "a legitimate, age-neutral reason" for her termination).  With regard to judging Adams's job performance, it is "the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Hawkins v. PepsiCo., Inc.*, 203 F.3d at 274, 280 (4th Cir. 2000) (citation omitted), *cert. denied*, 531 U.S. 875 (2000); *see Rogosin v. Mayor and City Council of Baltimore*, 197 F. Supp. 2d 345, 353 (D. Md. 2002) ("Whether [the decision maker's] beliefs were right or wrong is immaterial; what is relevant and undisputed in this case is that [the decision maker] relied on those beliefs as grounds for dismissing Plaintiffs.")  Judge Chasanow's observations in *Khoury v. Meserve*, 268 F. Supp. 2d 600, 615 (D. Md. 2003), are apt: "This court's task is not to sit, in this context, as a super personnel agency.  It is not enough for Plaintiff to allege pretext based on her own view of the truth; in order to rebut Defendant's non-discriminatory reason, Plaintiff's task is to proffer evidence showing that Defendant's stated reason was not the real reason for its actions."  *See also Gibson v. Marjack Co.*, 718 F. Supp. 2d 649, 658 (D. Md. 2010) (granting summary judgment to employer on retaliation claim, where plaintiff offered "no evidence beyond his own unsubstantiated speculations that [the employer's] proffered reason for termination was actually a pretext for retaliation").

Given that WFA articulated a legitimate, nondiscriminatory ground to terminate Adams, Adams must, in order to survive summary judgment, proffer admissible evidence from which a reasonable jury could conclude "'*both* that [WFA's articulated] reason was false, *and* that discrimination was the real reason.'"  *Adams v. Trustees of Univ. of North Carolina–Wilmington*,

*supra*, 640 F.3d at 560 (quoting *Jiminez*, *supra*, 57 F.3d at 378) (emphasis in original)).  She has done neither.

As an initial matter, Adams does not dispute that she performed below WFA's expectations, that her revenue production was consistently lower than most other FAs, or that she was often absent from her assigned bank branches.  Instead, she suggests that other FAs also performed poorly, yet were not fired.  Thus, she concludes, her poor performance must not have been the reason she was fired.  However, for various reasons, the FAs to whom she compares herself are too dissimilar to serve as viable comparators.  *See Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010) (To prove the existence of a similarly situated comparator, Title VII plaintiffs must "show that they are similar in all relevant respects to their comparator.").

In particular, Adams focuses on February 2011, claiming that three other FAs had lower production numbers than she did.  Specifically, three male FAs brought in $535.82, $2,261.51, and $4,397.46, respectively.  However, Adams has failed to provide *any* other information about these three FAs.  For example, the record does not reflect whether the other three FAs underperformed in other months, whether they were on PIPs, whether they were often absent from their bank branches, or any other relevant information about them.  Thus, there is no basis to determine that the comparators are indeed similarly situated to plaintiff.  *See* Reply at 14 ("Adams has presented no evidence about these male FAs beyond the snapshot of a one month revenue review.  She did not ask about them in discovery or deposition."); *Cf. Sook Yoon v. Sebelius*, 481 F. App'x 848, 850 (4th Cir. 2012) ("Nor is there any suggestion that any of the Caucasian nurses had any history of misconduct or had received previous reprimands, as had [plaintiff].").

In fact, the only evidence in the record about the other three employees was submitted by WFA, and it shows that the three employees were quite dissimilar to plaintiff.  According to Ritz, two of the employees with low production numbers had already resigned from WFA, "on January 28, 2011 and February 8, 2011, respectively."  Ritz Aff. 2 ¶ 2.  As a result, the numbers relied upon by Adams for those two FAs primarily reflect "residual commissions" and do not accurately reflect their performance.  In any event, WFA could not possibly have fired them for their allegedly poor performance because they had already resigned.  As for Lester, the third purported comparator, Ritz explained that although the numbers cited by Adams reflect poor production for February, Lester's overall performance was far superior to that of Adams: "By March 18, 2011, however, Mr. Lester's year to date production for 2011 was $56,166.  During the same time period, Ms. Adams's production was $16,004."  *Id.* ¶ 3.  Therefore, no reasonable jury could infer that the three other FAs were similar to Adams in any relevant respect.

Adams also supports her claim of retaliation by arguing that WFA had a policy to "impose more stringent discipline on employees who engaged in protected activity."  Opp. at 20.  She points to the experiences of Tracy Weller, who Adams claims was fired in retaliation for "voicing concerns regarding unfair treatment due to gender or disability."  *Id.* at 20–21.  According to Adams, Weller was fired one week after participating in a phone conference to discuss issues that Weller had raised in a formal discrimination complaint.  Adams attaches an affidavit from Weller, in which Weller avers: "I believe [WFA] retaliated against me because I complained about workplace discrimination the month before."  Opp. Ex. 8, ECF 57-10.

The circumstances surrounding Weller's termination cannot support a jury verdict in favor of Adams.  As a matter of law, Adams cannot establish a company "policy" of retaliation

by pointing to the experiences of just one other person.  *See McCarthy v. New York City Technical Coll. of City Univ. of New York*, 202 F.3d 161, 165 (2d Cir. 2000) ("[P]laintiff's 'sample' of two was clearly insufficient to sustain a reasonable inference that [plaintiff's] treatment by the [defendant] was motivated by discriminatory intent." (internal quotation marks omitted)); *Hughes v. Alabama Dep't of Pub. Safety*, 994 F. Supp. 1395, 1401 (M.D. Ala. 1998) ("[A]n employer's treatment of one other employee does not establish a pattern and practice."), *aff'd*, 166 F.3d 353 (11th Cir. 1998).  *Cf. Int'l Broth. of Teamsters v. United States*, 431 U.S. 324 (1977) ("[To allege] a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights," the plaintiff "ultimately ha[s] to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts.").  In other words, even if Weller was indeed fired in retaliation for her protected activity, no reasonable jury could conclude, from that instance alone, that Adams was also fired for retaliatory reasons, rather than because of her poor performance and record of absenteeism.

In addition, Adams was terminated nearly nine months after she filed her EEOC charge, and more than three months after that charge was settled.  In her Opposition, Adams asserts that the temporal proximity of the settlement of her charge and her email to Ritz on March 2 permits her retaliation claim to proceed.  But, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'"  *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted).

Adams had a history of poor performance and attendance at WFA.  And, when Ritz sought the consent of Human Resources to terminate Adams, he had no knowledge that Adams

had filed or settled an EEOC claim.  *See* Ritz Aff. at ¶ 15; Ritz Dep. at 17.  Thus, Ritz could not

have retaliated against Adams based on her protected activity. *See Shields v. Fed. Exp. Corp.*,

120 F. App'x 956, 962 (4th Cir. 2005) (requiring knowledge of the protected activity by the

decision maker to establish a causal link).

For the foregoing reasons, I will grant summary judgment to WFA with respect to Counts

VI and VII of the SAC.

### Counts VIII–IX: Libel

Count VIII of the SAC is titled "Employment – Libel or Slander on Form U-5."  Count

IX is titled "Libel."[12]   Both counts, which arise under Maryland law, contain the same

substantive allegation:  WFA defamed Adams by reporting on the Form U-5 that Adams was

discharged because she failed to meet job performance expectations.  *See* SAC ¶¶ 84, 90.  Adams

alleges that the statement on the Form U-5 was false because the real reasons she was terminated

were gender discrimination, disability discrimination, and retaliation.  *See* SAC ¶¶ 87–88.

Because the claims are duplicative, and because the parties address them as one, I will address

them together.  *See Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773, 779 (D. Md. 2012).

"'A defamatory statement is one which tends to expose a person to public scorn, hatred,

contempt or ridicule, thereby discouraging others in the community from having a good opinion

of, or associating with, that person.'"  *Norman v. Borison,* 418 Md. 630, 645 n.10, 17 A.3d 697,

705 n.10 (2011) (quoting *Offen v. Brenner*, 402 Md. 191, 198–99, 935 A.2d 719, 723–24

(2007)); *see also Independent Newspapers, Inc. v. Brodie*, 407 Md. 415, 441, 966 A.2d 432, 448

---

[12] Libel refers to written words and slander refers to words that are spoken.  They are two
branches of the tort of defamation.  *Publish America, LLP v. Stern,* 216 Md. App. 82, ____ n.16
84 A.3d 237, 247 (2014).

(2009); *Shapiro*, 105 Md. App. at 772, 661 A.2d at 217.   As noted, the claim of defamation

arises under Maryland law.   In Maryland, a defamation claim consists of four elements: "(1) that

the defendant made a defamatory statement to a third person, (2) that the statement was false, (3)

that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby

suffered harm."   *Id.*   To prevail, a plaintiff must prove the falsity of the allegedly defamatory

statement.   *Piscatelli v. Van Smith,* 424 Md. 294, 306, 35 A.3d 1140, 1147 (2012).

WFA avers that it is entitled to summary judgment because "the alleged defamatory

statement is both true and privileged."   Memo at 42.   With regard to privilege, WFA claims that

employer statements on a Form U-5 are entitled to an absolute privilege or, at minimum, a

qualified privilege.   As pointed out by WFA, the New York Court of Appeals has held that

employer statements on a Form U-5 filing are subject to absolute privilege because of the quasi-

judicial nature of the National Association of Securities Dealers.   *See Rosenberg v. Metro. Life

Ins. Co.*, 8 N.Y. 3d 359 (2007).   However, Maryland courts have not yet considered whether an

employer enjoys an absolute privilege for statements made on a Form U-5, and it is not at all

clear how they would rule.[13]   In any event, I need not reach the issue, as I find that the statement

on the Form U-5 is entitled to a qualified privilege that has not been overcome.

Maryland courts have repeatedly held that "communications arising out of the employer-

employee relationship clearly enjoy a qualified privilege."   *McDermott v. Hughley*, 317 Md. 12,

---

[13] The view of the New York courts appears to be a minority viewpoint, as most courts have found the filing of U-5 forms insufficiently connected with the NASD's quasi-judicial purposes to support an absolute privilege.   *See Dawson v. New York Life Ins. Co.*, 135 F.3d 1158 (7th Cir. 1998); *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 137 (6th Cir. 1996); *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 708 (7th Cir. 1994); *Dickinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 431 F.Supp.2d 247, 261–62 (D. Conn. 2006); *Prudential Securities, Inc. v. Dalton*, 929 F. Supp. 1411, 1418 (N.D. Okla. 1996).

28–29, 561 A.2d 1038, 1046 (1989); *accord Gohari v. Darvish*, 363 Md. 42, 56, 767 A.2d 321,

328 (2001); *Lowery v. Smithsburg Emergency Med. Serv.*, 173 Md. App. 662, 680, 920 A.2d

546, 556 (2007).  In fact, Maryland has codified qualified privilege in the employer-employee

relationship.  Maryland Code (2013 Repl. Vol., 2013 Supp.) § 5-423 of the Courts & Judicial

Proceedings Article, titled "Employer Disclosures Relating to Job Performance or Reasons for

Termination of Employment," provides:

> (a) An employer acting in good faith may not be held liable for disclosing any
> information about the job performance or the reason for termination of
> employment of an employee or former employee of the employer:
> . . .
>> (2) If requested or required by a federal, State, or industry regulatory
>> authority or if the information is disclosed in a report, filing, or other
>> document required by law, rule, order, or regulation of the regulatory
>> authority.
>
> (b) An employer who discloses information under subsection (a) of this section
> shall be presumed to be acting in good faith unless it is shown by clear and
> convincing evidence that the employer:
>> (1) Acted with actual malice toward the employee or former employee; or
>> (2) Intentionally or recklessly disclosed false information about the
>> employee or former employee.

In light of Maryland's statutory provision bestowing a qualified privilege as to

information provided by an employer about the reason for termination of an employee, Adams

concedes that WFA's statements on the Form U-5 are entitled to a qualified privilege.  Opp. at

16.  Generally, when a statement enjoys a qualified privilege, the privilege defeats an action for

defamation.  *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 598–99, 350 A.2d 688, 698–99

(1976), *overruled on other grounds by Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 651

709 A.2d 1222, 1225 (1998); *see Shapiro*, 105 Md. App. at 778, 661 A.2d at 220.  However, as

Adams points out, a qualified privilege can be overcome or defeated if the employer acted with

"actual malice" toward the former employee.  *See id.* at 16–17.  A statement is made with actual malice if it "was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'"  *Batson v. Shiflett*, 325 Md. 684, 728, 602 A.2d 1191, 1213 (1992) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)); *see Attorney Grievance Comm'n of Maryland v. Frost*, 437 Md. 245, 85 A.3d 264, 282 (2014).  Actual malice must be proven by clear and convincing evidence.  *Batson*, 325 Md. at 728, 602 A.2d at 1213.

Adams argues that an employer's discriminatory animus satisfied the "actual malice" requirement.  *See* Opp. at 16–17.[14]  Therefore, according to Adams, if her discrimination or retaliation claims survive summary judgment, "then the defendant's request to dismiss [the defamation] counts should be overruled."  *Id.* at 17.  Under Adams's own theory, her defamation claims cannot survive summary judgment.   As discussed, *supra*, plaintiff's claims of discrimination and retaliation have either been waived or lack support in the record from which a reasonable jury could return a verdict in Adams's favor.  Because Adams relies on those same non-viable allegations of discrimination and retaliation in her attempt to show actual malice, plaintiff's defamation claims must also be rejected.  *Cf. Boyer-Liberto*, *supra*, slip op. at 18 (because hostile work environment claim failed as a matter of law, plaintiff's claim of objectively reasonable belief about a hostile work environment "fares no better . . . .").

---

[14] Plaintiff cites *Tierco Maryland, Inc. v. Williams,* 381 Md. 378, 849 A.2d 504 (2004) for the proposition that "an employer's discriminatory motivation may suffice to prove 'actual malice.'"  Opp. at 16.  No pin cite is provided for that assertion, however.  *Tierco* was not a defamation case.  It focused largely on procedural issues in a case involving tort claims of assault, negligent supervision, and false imprisonment arising out of an altercation between patrons and staff at an amusement park.  Racial animus pervaded the allegations, although such allegations had not been pled as part of the claim.  In a footnote, 381 Md. at 414 n.29, 849 A.2d at 526, the Maryland Court of Appeals said:  "As we are remanding for a new trial, evidence of racial animus, if properly linked to the causes of action pled, may be relevant to establish actual malice for the purposes of the punitive damages claim."

WFA is entitled to a qualified privilege for its statement on the Form U-5, and Adams has not brought forth adequate evidence to generate a triable issue with respect to her contention that WFA acted with actual malice.   Accordingly, I will grant summary judgment to WFA as to Counts VIII and IX.

### Count X: Unlawful Withholding of Wages

In Count X, pursuant to the MWPCL, Adams alleges that she "participated in the 4Front bonus program and exceeded the requirements to earn her bonus wages," and yet has not received any bonus wages.   SAC ¶ 94.   According to Adams, she created and presented more than 25 financial plans to her clients before the deadline of June 30, 2010, thereby entitling her to the promised cash award.   WFA avers that Adams is not entitled to the bonus because she "had not done all of the work required to earn the bonus."   Memo at 45.   In particular, WFA contends that "payment was conditioned on a multitude of criteria, which included performing additional ongoing duties with clients over a period of nine years," which Adams did not perform.   *Id.*

Adams does not deny that the 4Front program included requirements that were to be fulfilled over a nine-year period, nor does she contend that she has satisfied those requirements. However, she argues that the program's requirement that the FA continue to perform ongoing duties for nine years "is a clear violation of . . . Maryland wage laws."   Opp. at 5.   Specifically, Adams argues that "employers cannot place conditions of 'vesting' or continued employment on *performance-based wages* (as opposed to 'gratuitous' bonuses like profit-sharing plans)."   *Id.* (emphasis in original).   In Adams's view, Maryland statutory and common law "hold[] that once the employee performs the requested work (here, creating the financial plans and delivering them to the client) the wage becomes due and must be paid…period; and the employer cannot place

additional conditions on payment." *Id.* at 6 (ellipsis in original). Moreover, Adams asserts that there is a genuine dispute of material fact as to whether she did the necessary work, thereby requiring a jury trial. *Id.*

In response, WFA argues that "the record is clear [Adams] did not earn the bonus, that Adams "fundamental[ly] misunderstand[s]" the MWPCL, and that Adams has misapplied case law. Reply at 1, 8.

The MWPCL states, in part: "[E]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." L.E. § 3-505. In other words, "where an employee earns wages under the Act, the employer must pay them, regardless of the ensuing termination of the employee." *Medex v. McCabe*, 372 Md. 28, 39, 811 A.2d 297, 304 (2002).

The principal purpose of the MWPCL "was to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages." *Battaglia v. Clinical Perfusionists, Inc.*, 338 Md. 352, 363, 658 A.2d 680, 686 (1995). An employee's right to wages vests when she has "'performed all the work necessary to earn the fees.'" *Catalyst Health Solutions, Inc. v. Magill*, 414 Md. 457, 475, 995 A.2d 960, 970 (2010) (quoting *Medex*, 372 Md. at 36, 811 A.2d at 302).

Critically, an employer and employee cannot contract around L.E. § 3-505, because "a contract conflicting with public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy." *Medex*, 372 Md. at 39, 811 A.2d at 304 (internal quotation marks omitted); *see generally Marshall v. Safeway, Inc.*, ___ Md. ___, ___ A.3d ___,

2014 WL 1227629, at *7–*10 (Mar. 26, 2014);[15] *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 303–04, 783 A.2d 667, 671–72 (2001).

*Medex* is the seminal Maryland case addressing L.E. § 3-505.  There, the plaintiff, McCabe, was employed as a sales representative for Medex, a medical supplies manufacturer. 372 Md. at 33, 811 A.2d at 300.  Part of McCabe's promised compensation was in the form of incentive fees, which his employee manual stated were conditioned upon McCabe meeting certain performance goals, "being an employee at the end of the incentive plan (generally the fiscal year) *and being employed at the time of actual payment.*"  *Id.* (emphasis in original) (internal quotation marks omitted).  McCabe earned incentive fees for the fiscal year ending on January 31, 2000, but he resigned from his position just four days after the end of the fiscal year. *Id.*  Under the incentive plan, payment of incentive fees were not scheduled to be made until March 31, 2000.  At that time, Medex refused to pay McCabe his fees because he was not employed at the time of actual payment, as required by the employee manual.  *Id.* at 33–34, 881 A.2d at 300–301.

As a result, McCabe filed suit against Medex.  The Maryland Court of Appeals ruled in favor of McCabe, concluding that "an employee's right to compensation vests when the employee does everything required to earn the wages." *Id.* at 41, 811 A.2d at 305.  And, according to the court, an employer cannot condition payment of wages that have vested on the employee's continued employment with the employer.  *Id.*  To hold otherwise, according to the

---

[15] The MWPCL is distinct from the Maryland Wage and Hour Law, which is the "Maryland counterpart to the Federal Fair Labor Standards Act." *Friolo v. Frankel, et al.*, ___ Md. ___, ___ A.3d ___, slip op. at 1–2 (May 19, 2014); *see Butler v. DirectSat USA, LLC*, 800 F. Supp. 2d 662, 669 (D. Md. 2011) ("MWPCL claims are limited to actions challenging the timing or mechanisms of wage payment and not actions seeking to establish entitlement to payment.").

court, "would place the rights of employees to these wages at the whim of the employer, who could simply terminate any at-will employee whose incentive fees it didn't wish to pay." *Id.* at 42, 811 A.2d at 305.

The holding of *Medex* is of no help to Adams. *Medex* holds that, once an employee "does everything required to earn the wages," *id.* at 41, 811 A.2d at 305, her right to receipt of the wages vests and cannot be withheld simply because her employment is terminated prior to the date of payment. Here, however, it is undisputed that Adams did not do "everything required to earn the wages," as she did not perform the ongoing duties required by the 4Front plan. In this respect, the circumstances of the present case are similar to those presented in *McLaughlin v. Murphy*, 372 F. Supp. 2d 465 (D. Md. 2004).

In *McLaughlin*, payment of commissions was conditioned on the closing of loans, and the plaintiff sought commissions on loans "that he prospected and was developing at the time of his termination," but had not yet closed. *Id.* at 468. The court ruled in favor of the defendant, distinguishing *Medex* on the grounds that the commission was "not linked to an arbitrary factor such as employment on a particular date, but to a reasonable job requirement." *Id.* at 474. The court continued, *id.* (citation omitted):

> If [plaintiff's] job were simply to find loan clients and start the process, then [defendant] would have to pay him for his efforts. But the contract makes clear that his job was to prospect, develop, and settle loans completely, and that he would be paid when those duties were performed. Under the MWPCL, only when McLaughlin completed *all* those tasks would his right to any payment vest.

The situation here is analogous. The 4Front Program did not require only that the FA create 25 financial plans; rather, it also required the FA annually to update the financial plans she had created, to engage in ongoing counseling with the clients for whom the plans were created,

to retain the clients' long-term business, and to ensure the accounts achieved a level of financial success.   These requirements were not arbitrary; rather, they served WFA's legitimate goals of increasing client loyalty and retention.   Thus, like the requirements in *McLaughlin*, the requirements of the 4Front Program do not violate the MWPCL.

The undisputed facts conclusively show that Adams did not complete all of the 4Front Program's requirements.   As a result, her right to payment under the 4Front Program never vested.   Accordingly, I will grant summary judgment to WFA on Count X of the SAC.

### Counts XI–XIII

In her SAC, plaintiff asserts claims for unlawful withholding of wages earned as commission income, in violation of the MWPCL (Count XI); fraud in the inducement (Count XII); intentional infliction of emotional distress (Count XIII).   But, she does not offer any argument in opposition to summary judgment for these claims.   Accordingly, she has abandoned them.   *See Grant-Fletcher v. McMullen & Drury, P.A.*, 964 F. Supp. 2d 514, 525 (D. Md. 2013); *Wood v. Walton*, 855 F. Supp. 2d 494, 505 n.35 (D. Md. 2012); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997).

In any event, summary judgment in favor of defendant is warranted.   In Count XI, Adams asserts that WFA unlawfully withheld wages Adams earned as commission income in March of 2011.   SAC at 32–33.   In response to Adams's allegation, WFA avers: "[T]he irrefutable evidence is that WFA paid Adams commissions for the work she performed during March 2011."   Memo at 45.   And, WFA submitted a copy of Adams's Compensation Statement for March 2011, which shows that Adams's commission for that month was indeed credited to her as

an offset against the minimum wage draw she received.  *See* ECF 55-21 at 7.  Adams has not offered any evidence to the contrary.  Accordingly, I will grant summary judgment to WFA on Count XI of the SAC.

In Count XII, titled "Fraud in the Inducement," Adams claims that she was induced by WFA's false promises to enter into the Settlement Agreement.  This claim piggybacks on Adams's breach of contract claim—she alleges that WFA entered the contract with the contemporaneous intent to breach it.  In particular, Adams claims that WFA "entered into the EEOC Settlement Agreement with a present intent not to honor [the implied-in-fact condition of continued employment through, at minimum, the end of March 2011] and with the intent to fire [Adams] as soon as it could without it appearing retaliatory."  SAC ¶ 103.

By way of background, and to place the analysis in context, claims that sound in fraud implicate the heightened pleading standard of Fed. R. Civ. P. 9(b).  *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland CPA claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").  Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *United States ex rel.*

*Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)

(citation omitted).  In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when,

where, and how: the first paragraph of any newspaper story.'"  *Crest Construction II, Inc. v. Doe*,

660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).[16]

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent

misrepresentation, fraudulent concealment, and fraudulent inducement.'"  *Sass v. Andrew*, 152

Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted).  Regardless of the particular

theory, at trial the plaintiff must establish the elements of fraud "by clear and convincing

evidence."  *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In an action for fraudulent misrepresentation (which is the garden variety of fraud and

often is described simply as "fraud"), the plaintiff ordinarily must show:

> 1) that the defendant made a false representation to the plaintiff;
>
> 2) that its falsity was either known to the defendant or that the representation was
> made with reckless indifference as to its truth;
>
> 3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
>
> 4) that the plaintiff relied on the misrepresentation and had the right to rely on it;
> and

---

[16] Rule 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to
> formulate a defense by putting it on notice of the conduct complained of . . . .
> Second, Rule 9(b) exists to protect defendants from frivolous suits.  A third
> reason for the rule is to eliminate fraud actions in which all the facts are learned
> after discovery.  Finally, Rule 9(b) protects defendants from harm to their
> goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S&R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). The "misrepresentation must be made with the deliberate intent to deceive," *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)), and the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

"The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674, 886 A.2d 924, 929 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307, 334 A.2d 133, 136 (1975)); *see also Carroll Co. v. Sherwin-Williams Co.*, 848 F. Supp. 2d 557, 566 (D. Md. 2012) (articulating elements). It incorporates all of the elements of fraudulent misrepresentation or fraudulent concealment, with the added element that the defendant's fraud led the plaintiff to enter into a detrimental contractual agreement.

As a general rule, an action for fraudulent inducement "will lie only for misrepresentation of past or existing facts." *Learning Works, Inc. v. Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987); *see Wilson v. Ocwen Loan Servicing LLC*, 2013 WL 5276543, at *5 (D. Md. Sept. 18, 2013), *aff'd*, 2014 WL 1015985 (4th Cir. Mar. 18, 2014). However, Maryland law also recognizes "a cause of action for fraud predicated upon a promise made with a present intention not to perform it." *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 232, 469 A.2d 867, 888 (1984); *accord Sass*, 152 Md. App. at 436, 832 A.2d at 264; *Parker v. Columbia Bank*, 91 Md. App. 346, 360–61, 604 A.2d 521, 528 (1992); *200 N. Gilmor, LLC v. Capital One, Nat. Ass'n*, 863 F. Supp. 2d 480, 495 (D. Md. 2012); *Gooden v. Wells Fargo Home Mortg.*, No. AW–08–2521, 2010 WL 1068119, at *4 (D. Md. Mar. 17, 2010). "The gist of the fraud in such cases is . . . the false representation of an existing intention to perform where such intent is in fact non-existent . . . ." *Tufts v. Poore*, 219 Md. 1, 12, 147 A.2d 717 (1959); *see Sass*, 152 Md. App. at 436, 832 A.2d at 264.

The Maryland Court of Special Appeals addressed this standard at length in *Sass*, 152 Md. App. 406, 832 A.2d 247.[17]   In that case, the plaintiff alleged that defendant Sass committed fraud by entering into a construction contract without the present intent to perform the contract. *Id.* at 436, 832 A.2d at 264. The jury found for the plaintiff, but the Court of Special Appeals reversed, concluding that "there was insufficient evidence to establish that Sass never intended to

---

[17] Although *Sass* was before the Court of Special Appeals on appeal from a jury verdict, it provides guidance on the showing required on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("[T]he inquiry under [a motion for judgment and a summary judgment motion] is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

perform." *Id.* at 441, 832 A.2d at 267.   The court noted that plaintiff had produced no direct evidence that defendant, at the time he entered into the contract, lacked the intention to perform. *Id.* at 437, 832 A.2d at 265 ("[W]e have searched the citations in the record extract identified by appellee in support of her repeated assertions that appellant admitted he never intended to perform the Contract when he signed it; we have found no such admissions by Sass.").   It also determined that plaintiff's allegation that Sass never intended to perform the contract was belied by "undisputed testimony [that Sass] took substantial action in furtherance of the Contract . . . Sass's part performance was inconsistent with [plaintiff's] contention that, when Sass executed the Contract, he never intended to perform." *Id.* at 437–38, 832 A.2d at 265.   Given the lack of any evidence suggesting that Sass signed the contract with the present intent not to perform, the court reversed the jury's fraud verdict. *Id.* at 441, 832 A.2d at 267.

Here, as in *Sass*, plaintiff has not proffered evidence from which a jury could conclude that WFA entered into the Settlement Agreement without the present intent to perform it.   To prevail at trial on her claim that WFA fraudulently induced her to enter into the Settlement Agreement, Adams would have to prove that WFA never intended to perform its obligations under the Settlement Agreement.   But, Adams has not pointed to any evidence in the record from which a jury could so conclude.   Indeed, it is undisputed that WFA satisfied several of its other obligations under the Settlement Agreement, including paying Adams $75,000 and amending the Form U-4.   Thus, even if Adams prevails on her breach of contract claim, no jury could also conclude, from the evidence in the record, that WFA intended to breach the Settlement Agreement at the time it was entered. *See Celotex*, *supra,* 477 U.S. at 322–23 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Accordingly, I will grant summary judgment to WFA on Count XII of the SAC.

In Count XIII, Adams alleges intentional infliction of emotional distress ("IIED"). The tort of IIED was first recognized by the Maryland Court of Appeals in *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977). In order to prevail in Maryland on a claim for IIED, plaintiffs must show that (1) the defendants' conduct was intentional or reckless; (2) their conduct was extreme and outrageous; (3) there was a causal connection between the defendants' wrongful conduct and the emotional distress suffered; and (4) the emotional distress was severe. *Id.* at 566, 380 A.2d at 614; *accord Caldor, Inc. v. Bowden*, 330 Md. 632, 641–42, 625 A.2d 959, 963 (1993); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010); *see also Gantt v. Sec., USA*, 356 F.3d 547, 552 (4th Cir. 2004); *Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 452 (D. Md. 2011); *Farasat v. Poulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997).

For conduct to be considered "intentional or reckless," a plaintiff "must allege and prove that the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow." *Foor v. Juvenile Servs. Admin.*, 78 Md. App. 151, 175, 552 A.2d 947, 959 (1989) (emphasis in original); *see Brengle*, 804 F. Supp. 2d at 452. Moreover, "[t]he 'extreme and outrageous' standard is quite high." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 758 (D. Md. 2011); *see also Lasater*, 194 Md. App. at 448, 5 A.3d at 89. In particular, the defendants'

conduct "must completely violate human dignity, and strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008) (quotation marks omitted).

Claims for intentional infliction of emotional distress are disfavored and difficult to establish and, as such, are "rarely viable." *Respess*, 770 F. Supp. 2d at 757. Indeed, the Maryland Court of Appeals has said that this "tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Ky. Fried Chicken Nat'l Mgmt. v. Weathersby*, 326 Md. 663, 670, 607 A.2d 8, 11 (1992). "As inappropriate and repulsive as workplace harassment is, such execrable behavior almost never rises to the level of outrageousness, and almost never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim of intentional infliction of emotional distress under Maryland law." *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 466 (D. Md. 2002).

Adams's IIED claim is predicated on her allegations that WFA breached the Settlement Agreement, refused to pay her commissions and 4Front award, refused to "provide her support," and "marr[ed] her Form U-5." SAC ¶ 110. Several of these allegations are unsupported by the record. *See supra*. In any event, the alleged conduct falls far short of "completely violat[ing] human dignity," as is required for a viable IIED claim. *Cf. Collier v. Ram Partners, Inc.*, 159 F. Supp. 2d 889, 902 (D. Md. 2001) (granting summary judgment to defendant on IIED claim, even though plaintiff was subjected to racial epithets and racist remarks and was physically threatened). Accordingly, I will grant summary judgment to WFA on Count XIII of the SAC.

**CONCLUSION**

For the foregoing reasons, I will deny the Motion with respect to Count I and grant the Motion with respect to Counts II–XIII.   A separate Order follows, consistent with this Memorandum Opinion.


Date: May 21, 2014                                             _____/s/_____
                                                                             Ellen Lipton Hollander
                                                                             United States District Judge